# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| v. | |
| ROMEL ANTHONY <br> A/K/A "DAME" | No. 15-180-14 |

Goldberg, J.                                                                 December 13, 2018

## MEMORANDUM OPINION

The multi-defendant superseding indictment in this case describes an ongoing conspiracy whereby drug dealers and other victims were targeted for armed home invasion robberies. It is alleged that these crimes occurred over several years, involving twelve separate incidents. Defendant Romel Anthony was only involved in one of these incidents and was found guilty of attempted possession with intent to distribute cocaine in violation of 21 U.S.C. § 846 (Count Four), but was acquitted on the charge of using or possessing a firearm in furtherance of a federal crime pursuant to 18 U.S.C. § 924(c) (Count Five).

Defendant Anthony currently moves for acquittal or, in the alternative, a new trial on Count Four, arguing that there was insufficient evidence presented at trial. He also asserts that the Government's use of historical cell-site location information ("CSLI") violated his Fourth Amendment rights, in light of the recent Supreme Court decision in Carpenter v. United States, 138 S. Ct. 2206 (2018). For the following reasons, Defendant Anthony's Motions will be denied.

I.  **PROCEDURAL BACKGROUND**

On April 28, 2015, a federal grand jury returned a seventeen-count indictment charging Defendant Anthony and fifteen co-Defendants. The grand jury subsequently returned a thirty-count superseding indictment on May 26, 2016, charging the original sixteen defendants and adding four defendants. Six of the Defendants, Marcus Bowens, Michael Queen, Daniel Hayes, Jeffrey Bellamy, Eric Scott, and Louis Miller, eventually entered into cooperation plea agreements with the Government. Scott and Bowens testified on the Government's behalf against Defendant Anthony.

Both the original and superseding indictments charge a conspiracy "[f]rom in or around September 2012 through on or about April 29, 2014," in violation of the Hobbs Act, 18 U.S.C. § 1951(a). The superseding indictment describes eleven incidents as part of the conspiracy, as well as one independent incident, amounting to twelve total incidents. Only the details of one of the incidents are relevant to Defendant Anthony and the issues addressed in this Opinion: an attempt by Defendant Anthony and his cohorts to break into the home of a drug dealer and steal cocaine and/or drug proceeds (Counts Four and Five) (the "Bristol Street" Incident).

Defendant Anthony was tried separately[1] for this incident and, on June 12, 2018, the jury convicted Defendant Anthony only on Count Four, attempted possession with intent to distribute cocaine in violation of 21 U.S.C. § 846.

---

[1] On October 28, 2016, Magistrate Judge Timothy Rice, who handled all pretrial matters, granted Defendant Anthony's Motion to Sever. Judge Rice noted that Defendant Anthony was only involved at the earliest stage of the crimes alleged in the Superseding Indictment and that a joint trial would involve weeks of testimony concerning a two-year criminal enterprise in which Defendant Anthony did not participate. He therefore concluded that "[i]t would be impractical to demand that a jury disregard such voluminous and highly prejudicial evidence, and limit its consideration of Defendant Anthony's guilt to only the September 11, 2012 charge." (Or. 10/28/16, ECF No. 351.)

On June 25, 2018, Defendant Anthony filed a post-verdict motion under Federal Rule of Criminal Procedure 29, arguing that the Government had presented insufficient evidence because the Government did not establish the existence of cocaine in the home. On July 2, 2018, Defendant Anthony filed a second post-verdict motion under Federal Rule of Criminal Procedure 33, based on the Supreme Court's recent decision in Carpenter v. United States, 138 S. Ct. 2206 (2018), where the Supreme Court held that the acquisition of CSLI constitutes a search within the meaning of the Fourth Amendment, thereby requiring the Government to obtain a warrant supported by probable cause.

Both of these Motions are now ripe for decision and, for the reasons discussed below, will be denied.

## II.  FACTUAL BACKGROUND

As noted above, Defendant Anthony was only involved in one of the incidents charged in the Superseding Indictment, referred to as "Bristol Street." This incident occurred on September 11, 2012, wherein co-Defendants Smith, Jefferson, and Scott climbed the rooftop of a building on the 4300 block of North 5th Street in Philadelphia to conduct surveillance on a Bristol Street resident. Defendant Anthony and his co-Defendants had planned to break into the home of a drug dealer to steal drugs and/or drug proceeds. Defendant Anthony stayed on the ground and acted as a lookout, along with co-Defendant Bowens. A search of the intended residence revealed a storage compartment where drugs and drug proceeds are typically stored.

The thrust of Defendant Anthony's sufficiency argument is that no drugs and/or drug proceeds were found in the residence that the Government witnesses identified (437 Bristol Street). Defendant Anthony stresses that the residence actually searched was 433 Bristol Street. (Def.'s Mot. Acquittal 6/25/18 ¶¶ 2–5, ECF No. 1435.)  As will be detailed infra, Defendant

Anthony was charged with attempted possession with the intent to distribute cocaine, which requires both intent and a substantial step toward the commission of possession with intent to distribute controlled substances. Third Circuit Model Criminal Jury Instruction No. 6.21.841.A (2015). Thus, it is immaterial which residence—433 or 437 Bristol Street—had a storage compartment for drugs and/or drug proceeds, as long as the Government established the intent to attempt to possess drugs with the intent to distribute. In any case, because Defendant Anthony has raised a sufficiency of the evidence challenge, for completeness sake, I will recount here the evidence presented by the Government:

1. Philadelphia Lieutenant William Hill testified that, on September 11, 2012, based on a neighbor's observation of two men on the roof, he responded to a call regarding a possible burglary in progress on Bristol Street. (N.T. 6/4/18 at 28:21–13.) Hill observed two men on the roof: one male was wearing a gray hoodie and black pants, while the other man was wearing a gray hoodie and tan cargo pants. (Id. at 29:22–30:16.) Hill observed both men wearing some type of mask. (Id. at 30:14–16.)

2. Hill then observed the two men flee from the roof. (N.T. 6/4/18 at 36:6–16.) Hill drove toward that general location and observed three men, two of whom were wearing the same clothes that Hill had observed the two men on the roof wearing. (Id. at 37:3–18.) As he followed the men, he alerted his co-officers of his observations, who stopped, and eventually arrested, these males after the two were identified by Hill as the persons on the roof. (Id. at 37:18–38:23.) The two men identified were Smith and Scott, and the third was Jefferson. (Id. at 39:4–22.)

3. After the arrests of Smith, Scott, and Jefferson, Hill walked back toward Bristol Street, whereby he found a bag, containing cut clothing commonly used as a mask. (Id. at 40:4–42:23.)

4. Hill informed Special Agent Jared Krzwyicki of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), who was also on the scene, that he had observed Scott and Smith carrying something in their hands. (Id. at 14:19–24.) Krzwyicki walked back toward Bristol Street, whereby he also found bags that contained cut t-shirt sleeves, which he knew was commonly used as a mask. (Id. at 15:1–17:21.) Krzwyicki also identified the two men in the gray hoodies as Smith and Scott, and the third man as Jefferson. (Id. at 12:17–13:14.)

5. Based on Hill's information that he saw Scott and Smith jump off a vending services building, Krzwyicki went to this building, spoke to the owner of the business, and conducted a walk-through of the building, wherein he observed a broken window on the second floor. (N.T. 6/5/18 at 23:8–25:23.)

6. Co-Defendant Eric Scott testified as a cooperating witness for the Government. (N.T. 6/5/18 at 99:17–22, 102:23–113:12.) Scott identified Jefferson as one participant, stating that he had met Jefferson two-to-three years before the Bristol Street Incident when they were both incarcerated. (Id. 115:9–116:6.)

7. Scott testified that he met Smith through Jefferson sometime during the summer of 2012. Scott identified Smith and a man by the name of "Junior" as participants in the Bristol Street Incident. Junior was an alias used by cooperating witness, Marcus Bowens. (Id. at 116:7–16, 124:7–21, 125:14–20.) Scott testified that Junior was present when he met Smith for the first time in the Summer of 2012. (Id. at 128:15–129:14.)

8. Scott detailed his involvement in the Bristol Street Incident, explaining that Jefferson and Smith contacted him regarding a "job" on September 10, 2012. (Id. at 132:7–24.) That same night, Scott met with Jefferson, Smith, Junior, and "Dame" at Fifteenth Street and Lenox Street. Scott identified Defendant Anthony as "Dame." (Id. at 132:25–133:12.) During this meeting, Jefferson, Smith, Defendant Anthony, Junior, and Scott discussed the burglary plan. (Id. at 136:10–137:16.) Jefferson, Smith, Scott, and Junior then drove to the target house on Bristol Street, where they discussed that Smith and Jefferson would climb onto the corner grocery store to reach the home's roof. Once on the roof, Smith and Jefferson would enter the targeted residence through the skylight, while Junior and Defendant Anthony stayed on the street using police scanners. (Id. at 134:22–136:1; 137:17–21.) Jefferson and Smith informed Scott that the burglary would occur on September 11, 2012, based on their information that the homeowners would leave around 8:00 a.m. (Id. at 140:4–141:4.) Scott testified that the goal of the burglary was to obtain "a couple hundred thousand in cash as well as bricks of drugs," which he explained were kilograms of cocaine. (Id. at 139:1–15.) Jefferson and Smith told Scott that these drugs were being stored in a closet inside of a trap floor. (Id. at 139:16–23.) After leaving the home on Bristol Street, they went their separate ways, with the understanding that the entire group was to meet again around 2:00 a.m. to 3:00 a.m. on September 11, 2012. (Id. at 143:8–22.)

9. Scott testified that he met Smith, Jefferson, Defendant Anthony, and Junior early in the morning of September 11, 2012. (Id. at 143:23–144:16.) They briefly prepared for the burglary and Scott described that they had the following items: police scanners, zip ties, gloves, a bag, and face masks. (Id. at 144:17–145:12.) They then travelled to Bristol Street in separate vehicles: Scott drove his friend's truck, Smith drove a Chrysler 300, and Defendant Anthony drove a white van. (Id. at 145:20–146:20.)

5

10. When they arrived at Bristol Street, Scott climbed the roof with Jefferson and Smith, while Defendant Anthony and Junior stayed on the street "to stay in contact with Jefferson and Smith that way they would know if the cops were – if a call came through that we were on the roof." (Id. at 146:18–147:16.) Defendant Anthony and Junior communicated with them on the roof using a cell phone and walkie talkie. (Id. at 147:17–22.) The three of them took turns sleeping on the roof. Later that morning, Jefferson woke Scott up on the roof and told him that "a call had come through," which Scott explained meant that Defendant Anthony or Junior had called to tell them that the police were coming based on a call on the police scanner. (Id. at 151:3–153:22.)

11. Scott testified that he had used a mask to conceal his identity during the burglary, but had thrown it once they reached Lawrence Street. Scott identified the cut t-shirt sleeve that the Government had found and taken into custody as his mask. (Id. at 153:23–154:20.)

12. Co-Defendant Marcus Bowens also testified as a cooperating witness for the Government. (N.T. 6/7/18 at 59:12–14, 60:10–69:8.) Bowens identified Smith, Jefferson, and Scott as participants in the plan. (Id. at 69:12—71:25, 73:10–74:12, 88:12–89:20.) Bowens also identified Defendant Anthony as a participant, referring to him as "Dame" and stating that he knew Dame through Dame's stepson. (Id. at 76:6–77:10.)

13. Bowens testified about his involvement in the Bristol Street Incident. (Id. at 77:11–15.) Bowens showed the jury the tattoo on his neck which was a symbol with "J-r period, like Junior." (Id. at 89:21–4.)

14. Bowens explained that he learned of the plan to burglarize the home to find drugs and money two or three weeks before September 11, 2012. Bowens learned from co-Defendants Smith and Woods that the man who lived at Bristol Street sold significant amounts of cocaine and stored the supply and money in his home. In the weeks leading up to September 11, 2012, Bowens, Smith, Woods, and Jefferson conducted surveillance of the home to identify when the man would routinely leave his home. (Id. at 78:12–82:13.) Bowens stated that the plan was as follows: Scott, Jefferson, and Smith would climb up on the roof and break into the home through a skylight. Dame (Defendant Anthony), Woods, and Bowens were to serve as lookouts. Bowens was in charge of monitoring the police scanner, while Dame stood watch at the other corner. (Id. at 84:1–85:23.)

15. In the weeks leading up to September 11, 2012, Jefferson added Scott to the crew. During a meeting approximately one week before the Incident, Smith, Jefferson, Woods, Scott, Bowens, and Defendant Anthony met to discuss plans for the burglary. It was during this meeting that Bowens learned that Smith added Defendant Anthony to the job to serve as a lookout. (Id. at 82:14–83:20.) Bowens testified that the entire crew met again two more times before the

Incident: the first meeting was close in time to the Bristol Street Incident and the second meeting was in the early morning hours of September 11, 2012. (Id. at 87:3–8.)

16. On September 11, 2012, Bowens met Smith, Jefferson, Defendant Anthony, and Scott around 4:00 a.m. Bowens explained that they prepared for the robbery by getting their clothes ready and gathering a crowbar, ladder, and other items needed to commit the robbery. The five of them then went to Bristol Street and Smith drove a black 300 Chrysler. (Id. at 90:14–93:15.) Once they arrived at Bristol Street, Bowens set up the police scanner to hear calls from the Philadelphia Police and observed Smith prepare his gun and put on a mask. (Id. at 93:16–94:11.) Smith, Jefferson, and Scott climbed up next to the restaurant and then climbed up onto the house. Defendant Anthony stayed as a lookout on Bristol Street and Fifth Street. (Id. at 94:12–96:3.) Bowens testified that he spoke with Smith and Defendant Anthony on a three-way call during this Incident (Id. at 97:12–99:13.)

17. Upon hearing a call on the police scanner that there were men on the roof at Bristol Street, Bowens alerted Smith of the call and helped Smith, Jefferson, and Scott flee. Bowens observed them jump off the roof, and walk past a police car. (Id. at 99:4–104:10.) Bowens then drove to pick up Defendant Anthony. (Id. at 105:11–12.)

18. Bowens identified the following items from the crime scene: Smith's black gun, Jefferson's silver and black gun, the two bags, a crowbar, and a t-shirt without sleeves, which he said was used as a mask. (N.T. 6/7/18 at 144:12–147:3.)

19. Scott identified the cut t-shirt sleeve that the Government had found and taken into custody as his mask. (N.T. 6/5/18 at 153:23–154:20.) When the Government showed Scott one of the guns that was found on September 11, 2012, Scott identified this gun as belonging to Smith. (Id. at 155:9–156:2.) Finally, Scott testified that he had used cell phone number 484-634-6830 during the Bristol Street Incident. (Id. at 159:1–25.)

20. Philadelphia Police Officer Jose Cartagena similarly testified during trial that he responded to a call around 5:22 p.m. on September 11, 2012 from Javencia Lopez. (N.T. 6/5/18 at 35:11–36:1; 38:1–18.). Ms. Lopez told Cartagena that she was the owner of the bar on Fifth Street and Bristol Street. She had called the police because she was concerned about two bags that her employee's had found on the roof. 38:14–39:34.) Using the Government's photographs, Cartagena identified the bar on Bristol Street and Fifth Street. Cartagena explained that his partner went onto the roof of the bar and picked up two bags. These bags contained two firearms, a crowbar, a black t-shirt with its sleeves cut off, and a receipt from the Franklin Mills Mall. Cartagena identified these physical items and specified that the guns were loaded with live rounds and secured with rubber bands. (Id. at 40:6–46:24.)

7

21. The Government also introduced DNA evidence that linked Smith to one of the firearms that was recovered from the scene of the Bristol Street Incident. (N.T. 6/5/18 at 54:3–24, 55:8–24, 56:1–21; 57:17–61:8, 68:6–11, 73:12–83:13; N.T. 6/7/18 at 114:3–122:9, 133:1–136:4.)

22. Special Agent David Krueger testified that he was an ATF agent who assisted with the larger conspiracy investigation and the Bristol Street Incident. (N.T. 6/7/18 at 3:1–6:6.) Krueger explained that he had conducted searches of residences, cellular phones, electronic devices, and vehicles during the course of his investigation. (Id. at 6:2–15.) Krueger described that he recovered Smith's Blackberry flip phone, Smith's iPhone, Jefferson's iPhone, and two of Woods' phones during the investigation of other incidents involved in this larger investigation. (Id. at 6:16– 17:3.) Krueger specifically testified about his effectuation of a search warrant for the Bristol Street Incident. His partner, Detective Morano, obtained a search warrant for 433 Bristol Street, which was based in part on Scott's information that this address contained a trapdoor for drug trafficking materials (among other evidence). (Id. at 17:4–21:12.) Krueger testified that, based on his experience and training, 433 Bristol Street was "the most fortified residence [he had] ever encountered," which indicated illegal drug trafficking activity. (Id. at 21:14–26:20.) During the search, Kreuger found a trap compartment on the second floor of 433 Bristol Street. (Id. at 32:1–36:9.) Krueger also explained that 433 Bristol Avenue was close in proximity to where the persons were observed on the roof. (Id. at 18:18–19:15.)

23. Philadelphia Police Officer John McKenna testified as an expert in the field of digital forensics. (N.T. 6/8/18 at 16:16–24:4.) McKenna testified that he conducted a digital analysis on the phones recovered by ATF agents belonging to Smith, Jefferson, and Woods. (Id. 24:4–26:11.) Specifically, McKenna testified that he conducted digital analysis on Smith's cellphone with the number 215-617-8610 and wrote a report. (Id. at 35:15–19.) In this report, McKenna testified that one of the contacts was listed as "D" for number 215-971-7033. (Id. at 36:14–37:4.) McKenna also introduced a series of text messages between Smith and Shaka Johnson, who was listed as "Lawer / Family" in Smith's contact list. Shaka Johnson sent a text to Smith that stated: "Big Homie THT nigga Dame said tell you to hit him, he got your paper." Smith responded to Shaka Johnson: "I'll meet him tonight." Smith immediately sent a second text message to Johnson that stated: "I'm about to send you his number." Smith immediately sent a third text message to Johnson that stated: "215-971-7033." (Id. at 66:9–68:11.) As noted above, Dame was identified as Defendant Anthony.

24. Special Agent Charlene Hennessy with ATF testified that she investigated the larger conspiracy, including the Bristol Street Incident, by collecting and analyzing the phone information. (N.T. 6/8/18 at 106:1–108:2.) Based on her review of Smith's cellphone records on September 11, 2012 between 3:00 a.m. and 12:00 p.m., Hennessy found nine outgoing calls and two incoming calls to the

8

number attributed to Defendant Anthony (i.e., cellphone number 215-971-7033), as well as fourteen other calls from Bowens and Jefferson. (Id. at 125:9–130:3.) Based on her review of Jefferson's cellphone records on September 11, 2012 between 3:00 a.m. and 12:00 p.m., Hennessy found one outgoing call to the number attributed to Defendant Anthony (i.e., cellphone number 215-971-7033), nine calls with Bowens, five calls with Scott, and six calls with Smith. (Id. at 130:6–131:24.) Hennessy walked through each of the calls between Defendant Anthony and Smith on September 11, 2012 between 6:03 a.m. and 10:48 a.m. Specifically, there was a three-way call between Smith and Defendant Anthony for almost three hours between 6:19 a.m. and 9:01 a.m. (Id. at 131:25–142:11.) Hennessy also testified that there were twenty-eight messages and calls between Jefferson and Defendant Anthony during the morning of September 11, 2012. (Id. at 145:3–16.) The call records showed numerous other calls between Scott, Jefferson, Smith, Woods, Defendant Anthony, and Bowens. (Id. at 145:5–150:23.)

25. Special Agent Mark Sonnendecker of the ATF Unit testified as an expert at trial in CSLI analysis. (N.T. 6/6/18 at 91:1–97:23.) Sonnendecker explained that a cell site is the set of antennas to which a cell phone connects in order to access a carrier's network. (Id. at 103:9–17.) Sonnendecker explained that he analyzed the CSLI for the phones of Smith and Jefferson. (Id. at 111:10–25.) Sonnendecker testified that the CSLI analysis showed that Smith and Jefferson were in the general area of Bristol Street and Fifth Street during the time of the Bristol Street Incident. (Id. at 119:18–124:11.)

## III. DEFENDANT ANTHONY'S MOTION FOR ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29

### A. Legal Standard

Federal Rule of Criminal Procedure 29(c) permits a defendant to "move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later. . . . If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." A motion for a post-verdict judgment of acquittal requires the court to "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979). The court must "draw all

9

reasonable inferences in favor of the jury verdict." United States v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996). "Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005).

A defendant bears an "extremely high" burden when challenging the sufficiency of the evidence supporting a jury verdict. United States v. Iglesias, 535 F.3d 150, 155 (3d Cir. 2008) (quoting United States v. Lore, 430 F.3d 190, 203-04 (3d Cir. 2005)). "Thus, a finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" United States v. Smith, 294 F.3d 473, 477 (3d Cir. 2002) (quoting United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984)).

### B. Sufficient Evidence Was Presented to Demonstrate that Defendant Anthony Was Guilty on Count Four – Attempted Possession with Intent to Distribute Cocaine

Defendant Anthony challenges the sufficiency of the evidence for his conviction on Count Four, attempted possession with the intent to distribute cocaine. Citing to United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987), Defendant Anthony focuses on the fact that the Government identified 437 West Bristol Street as the target of the burglary, but did not prove that cocaine was present or stored at 437 West Bristol Street. Instead, according to Defendant Anthony, the only physical evidence produced was the compartment used to store drugs, which was discovered during the execution of a search warrant for the wrong home (i.e., 433 West Bristol Street).

The Government responds that Defendant Anthony's argument confuses the elements of the charge because he was charged with "attempt" and the Government was therefore only required to prove the intent to commit the crime. I agree with the Government that there was no

need to prove that the targeted home actually contained drugs or drug proceeds, and that, instead, the Government had to prove that Defendant Anthony intended and attempted to burglarize a home that he thought contained drugs or drug proceeds. For the foregoing reasons, I find that sufficient evidence exists to implicate him in the crime charged, which was attempted possession with the intent to distribute cocaine in violation of 21 U.S.C. § 846.

Pursuant to 28 U.S.C. § 846, "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." To establish the crime of "attempt," the Government must present evidence demonstrating beyond a reasonable doubt that there was "(1) a shared unity of purpose, (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal, which [the defendant] knowingly joined." United States v. Claxton, 685 F.3d 300, 305 (3d Cir. 2012) (quoting United States v. Boria, 592 F.3d 476, 481 (3d Cir.2010)) (alteration in original). Accordingly, the crime of attempted possession with the intent to distribute cocaine requires both intent and a substantial step toward the commission of possession with intent to distribute controlled substances. Third Circuit Model Criminal Jury Instruction No. 6.21.841.A (2015). Notably, § 846 does not require the Government to prove the commission of any overt acts in furtherance of the conspiracy because the criminal agreement is the criminal act. United States v. Salahuddin, 765 F.3d 329, 338 (3d Cir. 2014) (citing United States v. Shabani, 513 U.S. 10, 16 (1994)).

The evidence presented at trial reflects that the Government sufficiently established the first element of "a shared unity of purpose" and the second element of "an intent to achieve a common illegal goal" where Scott and Bowens consistently testified about the plan to burglarize the home of a drug dealer that was located on Bristol Street in Philadelphia. The evidence

11

established that Defendant Anthony had the intent where he participated in the planning of the Bristol Street Incident, as well as a substantial step toward the commission of the offense by the attempted execution of this Incident. (See supra ¶¶ 6–9, 12–16.)

The Government also sufficiently established the third element of "an agreement to work toward the goal which the defendant knowingly joined" through the testimony of Scott and Bowens that Defendant Anthony acted as a lookout as part of the plan to burglarize the home to steal money and drugs. (See supra ¶¶ 10–11.) Scott explained that he was recruited just prior to the Bristol Street Incident and met the leader Smith, and the other participants Jefferson, Defendant Anthony, and Bowens (i.e., "Junior") on Lenox Street the night before the burglary. (See supra ¶¶ 6–9.) On the morning of the burglary, all of the defendants and Defendant Anthony met on Lenox Street before departing in separate vehicles. (See supra ¶ 8.) Scott explained that he, Jefferson, and Smith climbed on the roof to break into the target's home through a skylight. (See supra ¶ 10.) Defendant Anthony and Bowens remained on the street to act as lookouts, communicating with the others on the roof using cell phones and monitoring scanners to alert them of police activity. (See supra ¶ 11.) Scott testified that they were unable to break into the home because a call had come through on the police scanner and they had to jump off the roof. (See supra ¶ 10.)

Bowens similarly implicated Defendant Anthony as the lookout. (See supra ¶¶ 12–16.) Bowens was involved in the plan from the early planning stages and testified that he learned of Defendant Anthony's involvement about a week prior to the Bristol Street Incident. (See supra ¶¶ 15.) Bowens explained that he observed Smith describe the plan to Defendant Anthony, instructing that Defendant Anthony would be the lookout. (See supra ¶¶ 15–16.) Bowens explained that he, Smith, Jefferson, Defendant Anthony, and Scott discussed the details of their

plan at a second meeting before September 11, 2012. On the morning of September 11, 2012, the participants met on Lenox Street to prepare for the burglary and then departed for Bristol Street. Bowens testified that he and Defendant Anthony remained on the ground as lookouts while Smith, Jefferson, and Scott went onto the roof. Bowens explained that Scott, Smith, and Jefferson were unable to break into the home because he heard a call over the police scanner and alerted them that the police were on their way. (See supra ¶¶ 16–17.)

The testimony given by Bowens and Scott was also corroborated by physical evidence of two bags, two guns, a crowbar, and masks, as well as DNA evidence that linked Smith to one of the firearms recovered. (See supra ¶¶ 18–21.) Special Agent Krueger explained that he searched 433 Bristol Street and found a trap compartment on the second floor, which confirmed the planned purpose of stealing drugs and/or drug proceeds. (See supra ¶ 22.)

The Government also introduced cell phone records from phones recovered by ATF agents belonging to Smith, Jefferson, and Woods. These phone records further corroborated the testimony and physical evidence by showing a series of calls between Defendant Anthony and the co-Defendants during the time of the Bristol Street Incident. (See supra ¶¶ 23–24.) Additionally, Special Agent Sonnendecker explained that he analyzed the CSLI for the phones of Smith and Jefferson, which showed that Smith and Jefferson were in the general area of Bristol Street and Fifth Street during the time of the Bristol Street Incident. (See supra ¶ 25.)

Defendant Anthony asserts that there was insufficient evidence because the Government did not find evidence of drugs in the home burglarized. However, Defendant Anthony's claim confuses the elements of the crime that the Government was required to prove at trial. As explained above, the Government only had to prove "attempt." Thus, it is inconsequential that the Government did not present evidence of drugs because the existence of illicit substances is

not one of the requisite elements of "attempt." As described in detail above, the location of the home that the Defendants intended to burglarize was consistently identified by Scott, Bowens, Hill, and Krzwyicki. Moreover, the Government presented substantial physical evidence that corroborated the witnesses' testimony, including photographs, guns, crowbars, masks, CSLI, and call records.

In light of the foregoing, Defendant Anthony's pending Motion filed pursuant to Federal Rule of Criminal Procedure 29 will be denied.

### IV. THE MOTION FOR A NEW TRIAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33

#### A. Legal Standard

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The interest of justice requires a new trial "if errors occurred during the trial, and it is reasonably possible that such error, or combination of errors, substantially influenced the jury's decision." United States v. Rich, 326 F. Supp. 2d 670, 673 (E.D. Pa. 2004) (citing United States v. Copple, 24 F.3d 535, 547 n.17 (3d Cir. 1994)); see also United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993) (holding that a new trial is required on the basis of evidentiary errors "only when the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial" (alterations and internal quotation marks omitted)).

A court considering whether a new trial is appropriate should first determine whether the defendant has correctly identified any errors during the trial, and, if so, undertake a harmless error analysis to determine whether those errors merit a new trial. This analysis requires consideration of the entire record, and the standard applied depends upon the nature of the error. If the error does not rise to the level of a constitutional violation, the conviction may stand so

long as it is "highly probable" that the error "did not contribute to the jury's judgment of conviction." United States v. Jannotti, 729 F.2d 213, 219 (3d Cir. 1984) (quoting Gov't of Virgin Islands v. Toto, 529 F.2d 278, 284 (3d Cir. 1976)).  If, however, constitutional violations have occurred, a new trial is warranted unless the violations are harmless beyond a reasonable doubt.  United States v. Molina–Guevara, 96 F.3d 698, 703 (3d Cir. 1996).

### B. Defendant Anthony Lacked Standing to Challenge the Use of Other Parties' CSLI

Defendant Anthony's Rule 33 Motion rests upon the use of CSLI data belonging to two co-Defendants, Smith and Jefferson.  The Government argues that Defendant Anthony lacks standing to challenge to seizure of this CSLI data because he cannot demonstrate any reasonable expectation of privacy in the information.  To successfully move for the suppression of evidence, Defendant Anthony must establish both that the search violated the Fourth Amendment and that he had a legitimate expectation of privacy in the place searched.  United States v. Stearn, 597 F.3d 540 (3d Cir. 2010).  "Fourth Amendment rights are personal rights, which, like some other constitutional rights, may not be vicariously asserted."  Rakas v. Illinois, 439 U.S. 128, 133–34 (1979).

Defendant Anthony's reliance on United States v. Payner, 447 U.S. 727 (1980) is misplaced because the Supreme Court explicitly held that "[a] defendant's Fourth Amendment rights are violated only when the challenged conduct invaded his legitimate expectation of privacy rather than that of a third party, and [defendant] possessed no privacy interest in the documents seized in this case."  Payner, 447 U.S. at 731–32.  Here, Defendant Anthony has not demonstrated that he had the reasonable expectation of privacy in the CSLI data of co-Defendants Smith and Jefferson.

### C. The Good Faith Exception to the Exclusionary Rule Applies to the Government's Use of CSLI

Even if Defendant Anthony had standing to challenge the admissibility of the CSLI evidence, I find that the exclusionary rule does not apply because the CSLI evidence was obtained in good faith. Defendant Anthony's Rule 33 Motion rests upon the Supreme Court's recent decision in Carpenter v. United States, 138 S. Ct. 2206 (2018), where the Supreme Court held that the acquisition of CSLI constitutes a search within the meaning of the Fourth Amendment, and requires the Government to obtain a warrant for CSLI that is supported by probable cause. Id. at 2221. In Carpenter, the Government requested two court orders from U.S. Magistrate Judges to obtain the defendant's CSLI data pursuant to the Stored Communications Act, which requires a standard of proof that "falls well short of the probable cause required for a warrant." Id. at 2211−12. The Supreme Court held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI. The location information obtained from Carpenter's wireless carriers was the product of a search." Id. at 2217. Because the acquisition of CSLI constitutes a search under the Fourth Amendment, "the Government must generally obtain a warrant supported by probable cause before acquiring such records." Id. at 2221.

Here, Defendant Anthony correctly states that the holding in Carpenter is retroactive because he has not yet been sentenced. Griffith v. Kentucky, 479 U.S. 314, 328 (1987) (holding that new rules announced by the Supreme Court apply retroactively to all cases that are not yet final or are on direct review). But, his Motion nevertheless lacks merit in light of the good faith exception to the exclusionary rule because "[w]hether to suppress evidence under the exclusionary rule is a separate question from whether the Government has violated an

individual's Fourth Amendment rights." United States v. Katzin, 769 F.3d 163, 169–70 (3d Cir. 2014) (citing Hudson v. Michigan, 547 U.S. 586, 591–92 (2006)).

The exclusionary rule is "a judicially created means of effectuating the rights secured by the Fourth Amendment" by preventing the government from introducing evidence in a criminal trial that was obtained in violation of the Fourth Amendment. Stone v. Powell, 428 U.S. 465, 482 (1976). The Third Circuit has clarified that "[s]imply because a Fourth Amendment violation occurs does not mean that exclusion necessarily follows." Katzin, 769 F.3d at 170. Importantly, there must be "[r]eal deterrent value" for the exclusionary rule to apply. The good faith exception recognizes this by balancing the social cost of suppression with the deterrent value. Davis v. United States, 564 U.S. 229, 237 (2011). Accordingly, the Supreme Court has applied the good faith exception to reliance on judicial decisions, holding that "searches conducted in objective reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." Katzin, 769 F.3d at 171–72 (quoting Davis, 564 U.S. at 241).

Based on this precedent, the pertinent question here is whether the Government reasonably relied on binding appellate precedent when it obtained the CSLI. Here, the Government applied to obtain historical CSLI from third-party cell phone providers under the Stored Communications Act, 18 U.S.C. § 2703.[2] The reviewing Magistrate Judges considered the applications and found that the agents had presented "specific and articulable facts" showing that there were reasonable grounds to believe that the contents of the historical CSLI were relevant and material to the Government's ongoing criminal investigation. 18 U.S.C. § 2703(d).

---

[2] Specifically, § 2703(d) requires the Government to obtain a court order: "A court order for disclosure under subsection (b) or (c) may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

The binding appellate precedent at this time was that "CSLI from cell phone calls is obtainable under a § 2703(d) order and that such an order does not require the traditional probable cause determination. Instead, the standard [wa]s governed by the text of § 2703(d)." In re Application of United States for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to Gov't, 620 F.3d 304, 313 (3d Cir. 2010); United States v. Stimler, 864 F.3d 253, 266 (3d Cir. 2017), reh'g granted, opinion vacated in part sub nom. United States v. Goldstein, No. 15-4094, 2018 WL 4139784 (3d Cir. Aug. 30, 2018) ("While the rapidly evolving nature of CSLI may one day give us a reason to reconsider the distinction between GPS and CSLI, we decline to do so today. We continue to adhere to our view of In re Application.").

Furthermore, prior to the Supreme Court's ruling in Carpenter, a majority of the circuit courts likewise held that cell phone users did not have a reasonable expectation of privacy in CSLI. See, e.g., United States v. Thompson, 866 F.3d 1149, 1159–60 (10th Cir. 2017), cert. granted, judgment vacated, 138 S. Ct. 2706 (2018) ("At this point, however, we can only speculate how the Supreme Court will address these concerns, now that it has taken up the question of historical CSLI by granting certiorari in *Carpenter* . . . . But again, today our analysis of the narrow issue of historical CSLI is governed by the third-party doctrine as it currently exists . . . . In sum, we hold that cell-phone users lack a reasonable expectation of privacy in their historical CSLI, which users voluntarily convey to third-party cell-service providers. Therefore, the district court did not err in granting the government's application for orders requesting historical CSLI under § 2703(d) or in admitting some of that CSLI at a pretrial proceeding."); United States v. Banks, 706 F. App'x 455, 457 (10th Cir. 2017), cert. granted, judgment vacated, 138 S. Ct. 2707 (2018) ("Users voluntarily convey CSLI to third parties who in turn create records of that information for their own business purposes. And because the

government's request for CSLI is not a search within the meaning of the Fourth Amendment, we conclude § 2703(d) is not unconstitutional."); United States v. Graham, 824 F.3d 421 (4th Cir. 2016) (applying the third-party doctrine to CSLI).

Notably, since the Supreme Court's ruling in Carpenter, other circuit courts have similarly held that the government's warrantless collection of CSLI conducted before the Carpenter decision falls within good faith exception to exclusionary rule. See, e.g., United States v. Curtis, No. 17-1833, 2018 WL 4042631 (7th Cir. Aug. 24, 2018); United States v. Joyner, 17-10289, 2018 WL 3853443, at *3 (11th Cir. Aug. 14, 2018); United States v. Zodhiates, No. 17-839-CR, 2018 WL 3977030, at *4 (2d Cir. Aug. 21, 2018); United States v. Chavez, 894 F.3d 593, 608 (4th Cir. 2018); United States v. Farrad, 895 F.3d 859, 891 n. 24 (6th Cir. 2018).

Therefore, I find that the Government's actions fall within the good faith exception to the exclusionary rule, given that the Government obtained CSLI data by way of court orders pursuant to the federal Stored Communications Act, which had been upheld as constitutional under the binding appellate precedent at the time. Consequently, Defendant Anthony's pending Motion filed pursuant to Federal Rule of Criminal Procedure 33 will be denied.

## V. CONCLUSION

For all of the reasons discussed above, I will deny Defendant Anthony's pending Motions filed pursuant to Federal Rules of Criminal Procedure 29 and 33.

An appropriate Order follows.